**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MAUREEN CARRIGAN, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION** |
| RECKITT BENCKISER, LLC, | |
| Defendant. | **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Maureen Carrigan ("Plaintiff") brings this class action complaint against Defendant Reckitt Benckiser LLC ("Defendant"), individually and on behalf of all others similarly situated, and alleges upon personal knowledge as to Plaintiff's acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's attorneys.

**NATURE OF THE ACTION**

1.      This is a consumer protection class action arising out of Defendant's false and misleading advertising of its glucosamine and chondroitin-based Move Free Advanced Products.

2.      Defendant markets, sells and distributes a line of glucosamine and chondroitin-based joint health dietary supplements under the "Schiff Move Free Advanced" brand name, and Defendant represents that these Move Free Advanced Products provide meaningful benefits to the joints of all consumers who use them.

3.      All of the Move Free Advanced Products in Defendant's joint health product line, through its labeling and packaging, and through Defendant's other advertising and marketing

materials, communicate the same substantive message to consumers: that the Move Free Advanced Products provide meaningful joint health benefits.

4.    These representations are designed to induce consumers to believe that Defendant's "Move Free" joint health Move Free Advanced Products are capable of actually providing meaningful benefits, and consumers purchase Defendant's Move Free Advanced joint health products solely for the purpose of enjoying these purported joint health benefits.

5.    Defendant's Move Free Advanced Products, however, are incapable of supporting or benefiting the health of human joints because the main ingredients in each of Defendant's joint health Move Free Advanced Products, either alone or in combination with other ingredients, cannot support or benefit joint health. Accordingly, Defendant's joint health representations are false, misleading and deceptive, and its joint health Move Free Advanced Products are worthless.

6.    Plaintiff brings this action individually and on behalf of all other similarly situated consumers to halt the dissemination of Defendant's false and misleading representations, correct the false and misleading perception Defendant's representations have created in the minds of consumers, and to obtain redress for those who have purchased any of Defendant's Move Free Advanced Products at issue.

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

7.    The Court has original jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members, and some of the members of the class are citizens of states different from Defendant.

8.    This Court has personal jurisdiction over Defendant because Defendant conducts business in Illinois. Defendant has marketed, promoted, distributed, and sold the Move Free

Advanced Products at issue in Illinois, rendering exercise of jurisdiction by Illinois courts permissible.

9.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district. Venue also is proper under 18 U.S.C. § 1965(a) because Defendant transacts substantial business in this district.

## PARTIES

10.     Plaintiff Maureen Carrigan is a citizen of the State of Illinois, and, at all times relevant to this action, resided in Will County, Illinois.

11.     During the class period, and in New Lenox, Illinois, Plaintiff was exposed to and saw Defendant's joint health benefit representations by reading the Schiff Move Free Advanced packaging and labeling, purchased Schiff Move Free Advanced at a Walgreens retail store located at 466 Nelson Road, New Lenox, Illinois 60451, and suffered injury in fact and lost money as a result of purchasing the falsely advertised product. Plaintiff purchased Schiff Move Free Advanced in reliance on the joint health representations listed on the Schiff Move Free Advanced product described herein and above, including those claims on the product label that Schiff Move Free Advanced is for "Joint Health," and assists with joint pain, flexibility and mobility because it would provide "mobility, comfort, strength, flexibility [and] lubrication." Plaintiff paid approximately $27.99 for the 80-count size of Schiff Move Free Advanced she purchased. Plaintiff purchased Schiff Move Free Advanced believing it would provide the advertised joint health benefits. The Move Free Advanced product that Plaintiff purchased, like all of Defendant's Move Free Advanced Products, cannot provide the advertised benefits. As a result of her purchase of the falsely advertised product, Plaintiff suffered injury-in-fact and lost money. Had Plaintiff known

the truth about Defendant's misrepresentations and omissions, Plaintiff would not have purchased Defendant's Move Free Advanced product. Plaintiff is not claiming physical harm or seeking the recovery of personal injury damages.

12.     Reckitt Benckiser LLC is a Delaware limited liability company with its principal place of business located in Parsippany, New Jersey.

13.     Defendant manufactures, advertises, markets, distributes, and sells Move Free Advanced Products at issue to tens of thousands of consumers in Illinois, and throughout the United States.

## FACTUAL ALLEGATIONS

I.      *Defendant's Glucosamine and Chondroitin Move Free Advanced Products*

14.     Defendant sells glucosamine and chondroitin-based Move Free Advanced Products through its own retail websites, www.movefree.com and www.schiffvitamins.com, and through various retail stores, like Target, Costco, Walmart, Sam's Club and Walgreens.

15.     Defendant's glucosamine and chondroitin-based Move Free Advanced Products are each sold under the "Schiff Move Free Advanced" brand name (collectively the "Move Free Advanced Products"):

- Schiff Move Free Advanced

- Schiff Move Free Advanced Plus MSM

- Schiff Move Free Advanced Plus MSM & Vitamin D

16.     The main ingredients of each Move Free Advanced Product are glucosamine hydrochloride and chondroitin sulfate.

17.     Each Move Free Advanced Product contains the same amount of glucosamine hydrochloride (1,500 mg) and chondroitin sulfate (200 mg) per serving.

18.     Each of the Move Free Advanced Products contains the same form of glucosamine – glucosamine hydrochloride. Glucosamine hydrochloride is a combination of glucosamine (an amino sugar that is produced by the body and that can be isolated from shellfish) and hydrochloric acid.

19.     Each of the Move Free Advanced Products also contains the same form of chondroitin – chondroitin sulfate. Chondroitin is a component of human connective tissues found in cartilage and bone. In supplements, chondroitin sulfate usually comes from animal cartilage.

20.     Sometimes called degenerative joint disease or degenerative arthritis, osteoarthritis is the most common chronic condition of the joints, affecting approximately 30 million Americans. Osteoarthritis can affect any joint, but it occurs most often in knees, hips, hands, and spine. According to the Arthritis Foundation, one in two adults will develop symptoms of osteoarthritis during their lives, and one in four adults will develop symptoms of hip osteoarthritis.

21.     Many of those who purchase the Move Free Advanced Products have not yet been diagnosed with arthritis because it is slow developing and has yet to advance to the point where the consumer seeks medical intervention. However, they nonetheless have early-stage arthritis. Knowing this, through its advertising and promotions, including on the Move Free Advanced Products' packaging, Defendant expressly and impliedly advertises that the Move Free Advanced Products treat and provide relief from the same symptoms experienced by those people whose arthritis has been diagnosed.

22.     According to the Arthritis Foundation and Mayo Clinic, the most common signs and symptoms of osteoarthritis include joint pain, tenderness, stiffness, and decreased range of motion.[1]

## II.     *Defendant's False and Deceptive Advertising*

23.     Defendant, through its advertisements, including on the Move Free Advanced Products' packaging and labeling, has consistently conveyed to consumers throughout the United States that the Move Free Advanced Products will support and promote joint health, reduce joint pain and reduce joint stiffness of all persons who ingest the Move Free Advanced Products.

24.     For instance, each of the Move Free Advanced Products are labelled as "JOINT HEALTH" supplements, and the packaging and labeling of each Move Free Advanced Product prominently states "SUPPORTS 5 SIGNS OF JOINT HEALTH: Mobility, Comfort, Strength, Flexibility, Lubrication", and contains a picture of a runner in motion.

---

[1]     https://www.mayoclinic.org/diseases-conditions/osteoarthritis/symptoms-causes/syc-20351925 (last visited September 18, 2018); https://www.arthritis.org/Documents/Sections/About-Arthritis/arthritis-facts-stats-figures.pdf (last visited September 18, 2018)

25.    The front packaging for the Move Free Advanced Products appears as follows:

  

26.    Because it attracts purchasers who suffer from arthritis and joint pain and reinforces the joint health benefit marketing message, the packaging for each of the Move Free Advanced Products prominently includes the Arthritis Foundation logo. To reinforce the advertising message, the Move Free Advanced Products' labeling states twice "Proud Sponsor of the ARTHRITIS FOUNDATION" and also that "Move Free® is proud to support the Arthritis Foundation's efforts to help people take control of arthritis. Funds from Move Free® are used for cutting-edge scientific research, advocacy and education."

27.    To reinforce the joint health benefits message, on the packaging for each of the Move Free Advanced Products, Defendant also states "HOW DOES MOVE FREE WORK? Move Free Advanced supports 5 signs of joint health: mobility, flexibility, strength, lubrication and

comfort so you can do the things you love," "Glucosamine is key for the formation of cartilage, an essential building block of your joints. Glucosamine also supports the mobility and flexibility you want in everyday life," and "Chondroitin is a building block of cartilage that supports joint strength by helping to resist compression in the joint. Chondroitin attracts fluid to your joints to support cushioning and lubrication."

28.     Defendant furthers these joint health representations on its Move Free Advanced Products' websites (www.movefree.com and www.schiffvitamins.com), including by stating that each of the Move Free Advanced Products are "to help aid in the relief of joint pain and to help support healthy joint function," and they "Support 5 signs of joint health: Mobility, Flexibility, Strength, Lubrication, and Comfort."

29.     Prior versions of Defendant's glucosamine and chondroitin-based Move Free products also were labelled as "Joint Health" supplements that provide "flexibility," "comfort," and "lubrication," and also contained a picture of a runner.

30.     Based on the current and former representations contained on Defendant's Move Free Advanced Products and on its websites, it is clear that the Move Free Advanced Products are intended to induce a common belief in consumers that the Move Free Advanced Products are capable of providing meaningful joint health benefits for all those who consume them.

### III.     *Scientific Studies Confirm That the Move Free Advanced Products Are Not Effective and Defendant's Joint Health Representations Are False, Deceptive and Misleading*

31.     Despite Defendant's representations, the ingredients in the Move Free Advanced Products, alone and in combination, have been extensively studied in large, well-conducted and published studies involving persons with and without diagnosed arthritis and have been proven to be ineffective at supporting or benefiting joint health, including by positively impacting the signs and symptoms of arthritis.

**Randomized Clinical Trials**

32.     Randomized clinical trials ("RCTs") are "the gold standard for determining the relationship of an agent to a health outcome." Federal Judicial Center, *Reference Manual on Scientific Evidence*, 555 (3d ed. 2011). "Double-blinded" RCTs, where neither the trial participants nor the researchers know which participants received the active ingredient is considered the optimal strategy.

33.     Glucosamine and chondroitin have been extensively studied in RCTs, and the well-conducted RCTs demonstrate that glucosamine and chondroitin, alone or in combination, are not effective at producing joint health benefits, including pain, stiffness, range of motion or flexibility benefits.

34.     The leading series of studies testing glucosamine and chondroitin are known as the "GAIT" studies. The GAIT studies were independently conducted, and funded by the National Institutes of Health (the "NIH"). The primary GAIT study cost over $12.5 million.

35.     In 2006, results from the primary GAIT study – a 1,583-patient, 24-month, multi-center RCT – were published in the New England Journal of Medicine (the "2006 GAIT Study"). The 2006 GAIT Study concluded: "[t]he analysis of the primary outcome measure did not show that either [glucosamine or chondroitin], alone or in combination, was efficacious …." Clegg, D. et al., *Glucosamine, Chondroitin Sulfate, and the Two in Combination for Painful Knee Osteoarthritis*, 354 New England J. of Med. 795, 806 (2006). The authors further explained the findings as follows: "Glucosamine and chondroitin sulfate alone or in combination did not reduce pain effectively in the overall group of patients" and "[a]nalysis of the primary outcome in the sub-group of patients with mild pain showed even smaller treatment effects."

36.     The 2006 GAIT Study also concluded that glucosamine hydrochloride (*i.e.*, the

version of glucosamine present in the Move Free Advanced Products), chondroitin, and their combination do not relieve joint stiffness, improve joint function, impact joint swelling, or improve health-related quality of life as measured by eight domains: vitality, physical functioning, bodily pain, general health perceptions, physical role functioning, emotional role functioning, social role functioning, and mental health.

37.     In 2008, findings from another NIH-funded GAIT study were published. *See* Sawitzke, A.D. et al., *The Effect of Glucosamine and/or Chondroitin Sulfate on the Progression of Knee Osteoarthritis: A GAIT Report*, 58(10) J. Arthritis Rheum. 3183–91 (Oct. 2008). The 2008 GAIT publication explored the effects of glucosamine, chondroitin, and their combination on progressive loss of joint space width. Loss of joint space width is a structural condition associated with increased joint pain and decreased joint mobility and flexibility, and is a precursor of arthritis. The researchers examined 572 persons and found "no significant differences in mean [joint space width] loss over 2 years between the treatment groups and the placebo group …." In other words, glucosamine and chondroitin, alone or in combination do not work and do not impact joint space width loss or otherwise help maintain or rebuild cartilage.

38.     In 2010, the NIH released a third set of results from the GAIT studies. *See* Sawitzke, A.D., *Clinical Efficacy And Safety Of Glucosamine, Chondroitin Sulphate, Their Combination, Celecoxib Or Placebo Taken To Treat Osteoarthritis Of The Knee: 2-Year Results From GAIT*, 69(8) Ann Rhem. Dis. 1459-64 (Aug. 2010). Authors of the 2010 GAIT report examined 662 persons over a two-year period and concluded that glucosamine and chondroitin, alone or in combination, do not provide pain, function, stiffness or mobility benefits. The authors also determined glucosamine and chondroitin do not benefit those with moderate-to-severe knee pain – a *post-hac*, secondary analysis which the original GAIT publication found inconclusive.

39.     In addition to the three GAIT studies, four other RCTs have examined a combination of glucosamine and chondroitin sulfate versus placebo. Each of these studies found glucosamine and chondroitin do not work.

40.     In 2007, Messier et al., published results from their 12-month, double-blind RCT examining 89 subjects in the United States. Messier SP et al., *Glucosamine/chondroitin combined with exercise for the treatment of knee osteoarthritis: a preliminary study*. Osteoarthritis and Cartilage, 15:1256-1266 (2007). Messier and co-authors concluded that daily consumption of a combination of glucosamine hydrochloride and chondroitin sulfate does not improve strength or provide joint pain, function, stiffness or mobility benefits.

41.     Fransen et al. (2014), was a double-blind, randomized, placebo-controlled clinical trial examining 605 participants over a 2-year period. Fransen M et al., *Glucosamine and chondroitin for knee osteoarthritis: a double-blind randomized placebo-controlled clinical trial evaluating single and combination regimens*, Ann Rheum Disease 74(5):851-858 (2014). Fransen concluded that glucosamine and chondroitin, alone or in combination, are no better than placebo for reducing pain or improving physical function:

> For the main symptomatic outcome … no significant effect on maximum knee pain over year 1 … was demonstrated for the three treatment allocations, compared with placebo. Over year 2 … there were no differences between the four allocations … and there was no significant difference in knee pain reduction between any of the treatment groups and placebo after adjusting for baseline values. Among the subgroup of 221 (37%) participants with severe knee pain … at baseline, there were no significant differences with respect to their maximum knee pain or global assessment and score across different treatment groups.

*Id.* at 3-4; *see also id.* at 5-6 ("there were no significant reductions in knee pain detected for glucosamine or chondroitin alone, or in combination, over the 2-year follow-up period versus placebo"). Fransen and her co-authors also concluded "[t]here were no significant differences" between consumption or glucosamine and/or chondroitin versus a placebo pill for any secondary

measures. These measures included pain, physical function, and health-related quality of life as measured by physical functioning, role limitations due to physical health problems, bodily pain, general health, vitality (energy/fatigue), social functioning, role limitations due to emotional problems, and mental health (psychological distress and psychological well-being).

42.    Using data obtained from NIH-funded initiatives, Yang et al. (2015), analyzed 1,625 participants over a 4-year period to estimate the effectiveness of the combination of glucosamine and chondroitin in relieving knee symptoms and slowing disease progression among patients with knee osteoarthritis. Yang et al., entitled *Effects of glucosamine and chondroitin on treating knee osteoarthritis: an analysis with marginal structural models*, Arthritis & Rheumatology, Vol. 63, No. 3, 714-23 (March 2015). In their report, which was published in the official journal of the American College of Rheumatology, Yang et al. reported that glucosamine and chondroitin combinations provided no clinically significant benefits in terms of reducing pain or stiffness, improving physical function or mobility, or delaying the progression of joint space narrowing or osteoarthritis.

43.    Roman-Blas et al. (2017), was a multi-center, randomized, double-blind, placebo-controlled clinical trial involving 164 participants who received a combination of glucosamine and chondroitin or placebo for six months. Roman-Blas et al., *Combined Treatment With Chondroitin Sulfate and Glucosamine Sulfate Shows No Superiority Over Placebo for Reduction of Joint Pain and Functional Impairment in Patients With Knee Osteoarthritis*, Arthritis & Rheumatology, Vol. 69, No. 1, 77-85 (Jan. 2017). Roman-Blas and co-authors found that a combination of glucosamine and chondroitin was inferior to a placebo pill in terms of reducing global pain. Glucosamine and chondroitin were also no better than a placebo pill "in any of the secondary outcomes measures," which included improvement in physical function, reduction in joint pain, or improvement in

investigator's global assessment of the participant.

44.     In 2016, Lugo et al., also published the results from a study comparing a combination of glucosamine and chondroitin versus placebo. Lugo et al., *Efficacy and tolerability of an undenatured type II collagen supplement in modulating knee osteoarthritis symptoms: a multicenter randomized, double-blind, placebo-controlled study*, Nutrition Journal (2016). Lugo was a multicenter, double-blind RCT examining 190 subjects over 180 days. Lugo and co-authors found that a combination of glucosamine hydrochloride (the same glucosamine version in the Move Free Advanced Products) and chondroitin sulfate was no better than placebo in terms of joint pain, stiffness, mobility or physical function.

45.     The results from GAIT and these other clinical studies testing glucosamine and chondroitin combinations versus placebo, are also consistent with the reported results of prior and subsequent studies.

46.     For example, a 1999 study involving 100 subjects by Houpt et al., entitled *Effect of glucosamine hydrochloride in the treatment of pain of osteoarthritis of the knee*, 26(11) J. Rheumatol. 2423-30 (1999), found that glucosamine hydrochloride performed no better than placebo at reducing pain at the conclusion of the eight week trial.

47.     Likewise, a 2004 study of 205 participants by McAlindon et al., entitled *Effectiveness of Glucosamine For Symptoms of Knee Osteoarthritis: Results From and Internet-Based Randomized Double-Blind Controlled Trial*, 117(9) Am. J. Med. 643-49 (Nov. 2004), concluded that "glucosamine was no more effective than placebo in treating symptoms of knee osteoarthritis," meaning glucosamine is ineffective. Dr. McAlindon and his co-authors assessed and found no difference between glucosamine and placebo in terms of pain, stiffness, physical function, or any other assessed outcome. *Id*. at 646 ("[W]e found no difference between the

glucosamine and placebo groups in any of the outcome measures, at any of the assessment time points.").

48.     A 2004 study by Cibere et al., entitled *Randomized, Double-Blind, Placebo-Controlled Glucosamine Discontinuation Trial In Knee Osteoarthritis*, 51(5) Arthritis Care & Research 738-45 (Oct. 15, 2004), studied users of glucosamine who claimed to have experienced at least moderate improvement after starting glucosamine. These patients were divided into two groups – one group that was given glucosamine and another group that was given a placebo. For six months, the primary outcome observed was the proportion of disease flares in the glucosamine and placebo groups. A secondary outcome was the time to disease flare. The study results reflected that there were no differences in either the primary or secondary outcomes for glucosamine and placebo. The authors concluded that the study provided no evidence of symptomatic benefit from continued use of glucosamine – in other words, any prior perceived benefits were due to the placebo effect and ***not*** glucosamine. *Id.* at 743 ("In this study, we found that knee OA disease flare occurred as frequently, as quickly, and as severely in patients who were randomized to continue receiving glucosamine compared with those who received placebo. As a result, the efficacy of glucosamine as a symptom-modifying drug in knee OA is not supported by our study.").

49.     A 2008 study by Rozendaal et al., entitled *Effect of Glucosamine Sulfate on Hip Osteoarthritis*, 148 Ann. of Intern. Med. 268-77 (2008), assessed the effectiveness of glucosamine on the symptoms and structural progression of hip osteoarthritis during two years of treatment. Rozendaal and co-authors examined 222 subjects and concluded that glucosamine was no better than placebo in reducing pain, improving physical function, or impacting the structural progression of osteoarthritis.

50.     On July 7, 2010, Wilkens et al., reported that there was no difference between

placebo and glucosamine for the treatment of low back pain and lumbar osteoarthritis and that neither glucosamine nor placebo were effective in reducing pain-related disability. The researchers also concluded that, "Based on our results, it seems unwise to recommend glucosamine to all patients" with low back pain and lumbar osteoarthritis. Wilkens et al., *Effect of Glucosamine on Pain-Related Disability in Patients With Chronic Low Back Pain and Degenerative Lumbar Osteoarthritis*, 304(1) JAMA 45-52 (July 7, 2010).

51.    Large, well-conducted clinical trials on persons without diagnosed arthritis have also been conducted, and these studies also demonstrate that glucosamine does not provide any joint health benefits, including reducing joint pain or stiffness, improving mobility, or slowing the progression of arthritis.

52.    Kwoh et al. (2014), is a report from a randomized, placebo-controlled clinical trial measuring the effect of glucosamine hydrochloride on joint degradation, joint pain, and physical function in 201 individuals. Kwoh et al., *Effect of Oral Glucosamine on Joint Structure in Individuals With Chronic Knee Pain*, Arthritis & Rheumatology, Vol 66, No. 4, 930-39 (Apr. 2014). Kwoh, which studied a mix of subjects with and without osteoarthritis, concluded that glucosamine supplementation does not provide any joint health, structural, pain or physical function benefits:

> In this 24-week study, we did not find any evidence that glucosamine is more effective than placebo in improving joint health, when assessed according to the outcomes of decreased cartilage deterioration on MRI, improvement of BMLs on MRI, decreased excretion of urinary CTX-II, and decreased pain or improved function.

*Id*. at 935.

53.    Runhaar et al. (2015), also examined subjects not diagnosed with arthritis and found no benefits from glucosamine. Runhaar was an independently-analyzed double-blind, placebo-

controlled, factorial design trial testing a diet-and-exercise program and 1500mg oral glucosamine or placebo on 407 subjects. Runhaar et al., *Prevention of Knee Osteoarthritis in Overweight Females: The First Preventative Randomized Controlled Trial in Osteoarthritis*, Am J Med, 128(8):888-895 (2015). Researchers examined the impact of daily glucosamine consumption on the incidence of knee osteoarthritis, as well as on pain and physical function. After 2.5 years, no effect from glucosamine was found on subjects' overall quality of life or knee pain, physical function, or the incidence of knee osteoarthritis.

54.     Based on data from 245 people without diagnosed osteoarthritis, de Vos et al. (2017) determined the impact of glucosamine consumption over an average time period of 6.6 years. de Vos et al., *Long-term effects of a lifestyle intervention and oral glucosamine sulphate in primary care on incident knee OA in overweight women*, Rheumatology, 56(8):1326-1334 (2017). Study participants consumed placebo or 1500 mg daily glucosamine and periodically reported knee pain, physical activity and quality of life, and had their joint space width was measured by radiograph. Based on six-year analysis, de Vos and co-researchers concluded that glucosamine consumption is not effective at preventing knee osteoarthritis as measured according to either joint space width changes or based on symptomatic changes that included impact on knee pain or joint stiffness.

55.     A 2017 study by Roman-Blas et al., entitled *The combined therapy with chondroitin sulfate plus glucosamine sulfate or chondroitin sulfate plus glucosamine hydrochloride does not improve joint damage in an experimental model of knee osteoarthritis in rabbits*, European Journal of Pharmacology, Vol. 794 8-14 (Jan. 2017), concluded that the combination of chondroitin sulfate and glucosamine sulfate and the combination of chondroitin sulfate and glucosamine

hydrochloride failed to improve structural damage or ameliorate the inflammatory profile of joint tissues.

56.     Kawasaki et al. (2008), is a randomized trial among 142 subjects with knee osteoarthritis entitled *Additive effects of glucosamine or risedronate for the treatment of osteoarthritis of the knee combined with home exercise: a prospective randomized 18-month trial*, Journal of Bone and Mineral Metabolism, Vol. 26 279-287 (Feb. 2008). Subjects were given 1500 mg glucosamine hydrochloride per day, and researchers assessed its impact on pain, function, and changes in joint space width. Results showed no effect "regarding any of the scales indicating no significant additive effect of glucosamine[.]" *Id*. at 279. This credible, large study found that glucosamine is ineffective for relieving pain, improving physical function (*e.g*., stiffness and mobility), or providing joint structural changes.

57.     Rindone et al. (2000), is a randomized, double-blind, controlled trial of 98 subjects entitled *Randomized, controlled trial of glucosamine for treating osteoarthritis of the knee,* The Western Journal of Medicine, Vol. 172 91-94 (2000). The investigators concluded that glucosamine "was no better than placebo in reducing pain[.]" *Id*. at 91.

58.     Cahlin et al. (2011), evaluated the clinical effects of glucosamine on osteoarthritis in the temporomandibular joints ("TMJs"). *No effect of glucosamine sulfate on osteoarthritis in the temporomandibular joints – a randomized, controlled, short-term study,* Oral Surgery, Oral Medicine, Oral Pathology, Oral Radiology, and Endodontology, Vol. 112 760-766 (2011). The trial concluded there were "[n]o differences in improvement between" glucosamine and a dummy pill. *Id*. at 760.

59.     Vitamin D has also been scientifically studied and demonstrated to not provide joint health benefits. Felson, et al. (2007), conducted an observational study among 992 subjects from

two longitudinal cohort studies (715 from the Framingham Osteoarthritis Study and 277 from the Boston Osteoarthritis of the Knee Study). *Low level of vitamin D and worsening of knee osteoarthritis: Results of two longitudinal studies*, Arthritis and Rheumatology, Vol. 56 129-136 (2007). The purpose of the study was to confirm reports that vitamin D deficiency is associated with an increased risk of joint space narrowing or cartilage loss in OA. No association was found between vitamin D levels and radiographic worsening of joint space indicative of joint pain, stiffness and progression of OA.

60.     Jin et al. (2016), conducted a two-year, randomized, double-blind, controlled trial among 413 subjects with knee osteoarthritis and low levels of vitamin D. *Effect of Vitamin D Supplementation on Tibial Cartilage Volume and Knee Pain Among Patients With Sympotomatic Knee Osteoarthritis,* JAMA, Vol. 315(10) 1005-1013 (2016). Results showed no significant differences between those consuming vitamin D and placebo in terms of changing cartilage volume, pain or biomarkers associated with OA progression, and the authors "findings do not support the use of vitamin D supplementation" for preventing cartilage loss or improving knee pain. *Id*. at 1005.

61.     Arden et al. (2016), conducted a randomized, double-blind, controlled trial among 474 subjects with knee osteoarthritis. *Maternal gestational vitamin D supplementation and offspring bone health (MAVIDOS): a multicentre, double-blind, randomised placebo-controlled trial*, The Lancet Diabetes and Endocrinology, Vol. 4 393-402 (2016). Subjects were assigned to vitamin D or placebo consumption for three years. The study assessed and found no differences in the rate of joint space narrowing, or changes in pain, physical function, or stiffness.

62.     McAlindon et al. (2013), conducted a randomized, double-blind, controlled trial among 146 subjects with knee osteoarthritis. *Effect of Vitamin D Supplementation on Progression*

*of Knee Pain and Cartilage Volume Loss in Patients With Symptomatic Osteoarthritis*, JAMA, Vol. 309(2) 155-162 (2013). Subjects were assigned to daily consumption of vitamin D or placebo for two years. The study assessed and found no differences at any time between vitamin D and placebo in terms of knee pain severity, cartilage volume loss, physical function, knee function, cartilage thickness, bone marrow lesions, or radiographic joint space width.

63.     Kalman et al. (2008), examined 20 subjects over 8 weeks and concluded that 80mg oral daily dosage of hyaluronic acid had no effect on pain, stiffness, function and use of acetaminophen when compared to placebo. *Effect of a natural extract of chicken combs with a high content of hyaluronic acid (Hyal-Joint®) on pain, stiffness and function in subjects with knee osteoarthritis: a pilot randomized double-blind placebo-controlled trial*, Nutrition Journal (2008) 7:3.

64.     Sato and Iwaso (2009), performed a placebo-controlled trial involving 37 knee OA subjects who consumed either 200 mg hyaluronic acid or placebo daily for 8 weeks. Effectiveness in the reduction of pain was assessed by changes in WOMAC scores. There "was no statistically significant differences observed between groups" for all outcomes including WOMAC pain, stiffness and activities of daily living over the 8 weeks. *An Effectiveness Study of Hyaluronic Acid (Hyabest® (J)) in the Treatment of Osteoarthritis of the Knee on the Patients in the United States*, J. New Rem. & Clin, Vo. 58(3) (2009).

65.     Sola et al. (2015), was a 12-week randomized, controlled trial investigating the effects of 80 mg of hyaluronic acid on 84 healthy subjects with mild knee pain. The study outcomes were strength, function, swelling, and pain. The authors found that hyaluronic acid was not more effective than placebo in terms of any outcome, including improving pain. *A low-fat yoghurt supplemented with a rooster comb extract on muscle joint function in adults with mild knee pain:*

*a randomized, double blind, parallel, placebo-controlled, clinical trial of efficacy*, Food Funct. Vol. 6(1): 3531-39 (2015).

66.     Tashiro et al. (2012), examined 60 subjects who consumed 200 mg hyaluronic acid or placebo daily for 12 months. Knee OA symptoms, including pain and stiffness were evaluated after 2, 4, 6 and 12 months of consuming hyaluronic acid or placebo. The authors found that hyaluronic acid was not more effective than placebo at any time point in terms of the total symptom score or for scores of "pain and stiffness in the knees," "condition of daily life," and "general activities." *Oral Administration of Polymer Hyaluronic Acid Alleviates Symptoms of Knee Osteoarthritis: A Double-Blind, Placebo-Controlled Study over a 12-Month Period*, The Scientific World Journal, Volume 2012, Article ID 167928 (2012).

67.     Debbi et al. (2011), analyzed 49 subjects with knee OA who consumed either 3,375 mg of MSM or placebo daily for 12 weeks. The primary outcomes were WOMAC scores, Aggregated Locomotor Function (ALF) score, SF-36 health survey score and the VAS pain score. Secondary outcomes were Knee Society Clinical Rating System scores. For the outcomes of WOMAC pain and stiffness, SF-36, ALF and secondary outcomes, MSM was statistically equal to placebo, far from a clinically relevant response. For total WOMAC and VAS pain, the authors concluded that "these, nor the results of previous studies are considered to be clinical improvements according to the criteria set forth by OMERACT and OARSI. This falls in agreement with the meta-analysis for DMSO/MSM performed by Brien et al. that also showed a significant but non-clinically significant improvement in WOMAC or VAS scales for pain in the MSM group." Thus, this study of a MSM dosage over 4 times the amount in Move Free Advanced demonstrated that MSM does not provide any clinically meaningful joint health benefits, including by relieving pain or stiffness, or improving physical function or mobility.

68.     Notarnicola et al. (2011), was a six-month, randomized, double-blind clinical trial involving 60 subjects consuming a combination of 5,000 mg of MSM and 7.2 mg boswellic acid or placebo. Notarnicola et al., *The "MESACA" Study: Methysulfonylmethane and Boswellic Acids in the Treatment of Gonarthrosis*, Adv Ther, 28(10):894-906 (2011). Authors examined pain and joint function differences after two and six months of consuming the MSM supplement or placebo. At two months, the group consuming the MSM supplement was worse than placebo for pain improvement, and there was no difference between groups in terms of impacting physical function. At six months, there were no differences in pain or physical function between those persons consuming a placebo pill or the MSM supplement. This study, Notarnicola (2011), demonstrates that a supplement containing MSM does not impact pain or physical function better than a placebo pill.

69.     Magrans-Courtney et al. (2011), reports the results from a randomized, double-blind, controlled trial among 30 subjects with knee osteoarthritis. Study participants were randomly assigned to consume either a placebo pill or a supplement containing 1,500 mg glucosamine hydrochloride, 1,200 mg chondroitin sulfate, 900 mg of MSM, and other herbal ingredients. Both groups participated in an exercise program for 14 weeks. The study's primary outcome measures included assessments of strength, pain, stiffness, and physical function. The study authors concluded that there were no benefits from consuming a placebo pill versus the combination glucosamine, chondroitin and MSM supplement in terms of strength, pain, stiffness, flexibility or mobility: "GCM [glucosamine, chondroitin and MSM] supplementation did not significantly affect remaining markers of isotonic or isokinetic strength, balance, functional capacity, markers of health, self-reported perceptions of pain, or indicators of quality of life."

70.     Tennet et al. (2017), reports the results of a randomized, double-blind, placebo-

controlled trial evaluating the use of MSM to improve physical function and quality of life, and to reduce pain in healthy persons. 180 subjects were assigned to either a placebo or 3,000 mg MSM daily for 8 weeks. The primary outcome measures were the Knee Osteoarthritis Outcome Score (KOOS) and the Profile of Moods States (POMS). The five KOOS subscales analyzed by Tennet et al. were: (1) knee pain; (2) other symptoms (*e.g.*, swelling, grinding or clicking when moving your knees, knee bending, and knee straightening); (3) physical function in daily living (i.e., the ability to move around); (4) physical function in sport and recreation (*e.g.*, difficulty squatting, running, jumping, pivoting and kneeling); and (5) knee-related quality of life. The authors found that MSM did not work at any time for anything: "MSM administered daily did not provide significant improvements in the 5 KOOS subscales or the 9 POMS subscales at 30 or 60 days." David J. Tennent et al., *A Randomized Controlled Trial Evaluating Methylsulfonylmethane Versus Placebo to Prevent Knee Pain in Military Initial Entry Trainees*, U.S. Army Medical Department Journal 21-25 (October-December 2017).

## Meta-analyses and Scientific Review Articles

71.     Well-conducted meta-analyses are considered a higher level of evidence than individual clinical trials as they provide a method to evaluate the aggregated results of all relevant studies according to their pooled effects and methodological quality.

72.     In a 2007 meta-analysis, Vlad et al., reviewed all randomized, double-blind, placebo-controlled studies involving glucosamine hydrochloride and concluded that "[g]lucosamine hydrochloride is not effective." *Glucosamine for Pain in Osteoarthritis*, 56:7 Arthritis Rheum. 2267-77 (2007); *see also id*. at 2275 ("[W]e believe that there is sufficient information to conclude that glucosamine hydrochloride lacks efficacy for pain in OA.").

73.     A 2010 meta-analysis by Wandel et al., entitled *Effects of Glucosamine,*

*Chondroitin, Or Placebo In Patients With Osteoarthritis Or Hip Or Knee: Network Meta-Analysis*,
BMJ 341:c4675 (2010), examined prior studies involving glucosamine and chondroitin, alone or
in combination, and whether they relieved the symptoms or progression of arthritis of the knee or
hip. This independent research team reported that glucosamine and chondroitin, alone or in
combination, did not reduce joint pain or have an impact on the narrowing of joint space: "Our
findings indicate that glucosamine, chondroitin, and their combination do not result in a relevant
reduction of joint pain nor affect joint space narrowing compared with placebo." *Id.* at 8. The
authors further concluded "[w]e believe it unlikely that future trials will show a clinically relevant
benefit of any of the evaluated preparations." *Id.*

74. In 2011, Miller and Clegg, after surveying the clinical study history of glucosamine
and chondroitin, concluded that, "[t]he cost-effectiveness of these dietary supplements alone or in
combination in the treatment of OA has not been demonstrated in North America." Miller, K. and
Clegg, D., *Glucosamine and Chondroitin Sulfate*, Rheum. Dis. Clin. N. Am. 37 103-118 (2011).

75. In 2012, a report by Rovati et al., entitled *Crystalline glucosamine sulfate in the
management of knee osteoarthritis: efficacy, safety, and pharmacokinetic properties*, Ther Adv
Muskoloskel Dis 4(3) 167-180, noted that glucosamine hydrochloride "ha[s] never been shown to
be effective."

76. The recent meta-analysis by Eriksen et al. (2014), included 25 glucosamine trials,
which collectively involved 3,458 patients. Eriksen, P et al., *Risk of bias and brand explain the
observed inconsistency in trials on glucosamine for symptomatic relief of osteoarthritis: A meta-
analysis of placebo-controlled trials*, Arthritis Care & Research 66:1844-1855 (2014). Eriksen and
co-authors found that "[i]n accordance with a previous analysis, we found that glucosamine
hydrochloride had no effect on pain" and "glucosamine by and large has no clinically important

effect."

77.     A 2016 scientific review by Vasiliadis et al., entitled *Glucosamine and chondroitin for the treatment of osteoarthritis*, World J. Orthop., Vol. 8, Issue 1 (Jan. 18, 2017), concluded that "[t]here is currently no convincing information on the efficacy of [glucosamine] or [chondroitin] as treatment options in [osteoarthritis], *id.* at 8, and "when only the information from best quality trials is considered, then none of these supplements seem to demonstrate any superiority [as compared to placebos]," *id.* at 6.

78.     In 2017, Runhaar and co-authors presented results from their meta-analysis of six glucosamine studies (1,663 patients) where the original authors agreed to share their study data for critical re-analysis. Runhaar et al., *No Treatment Effects of Oral Glucosamine for Subgroups of Knee and Hip Osteoarthritis Patients: An Individual Patient Data Meta-Analysis from the OA Trial Bank*, Osteoarthritis and Cartilage, Vol. 25 (2017). Runhaar (2017) is an "individual patient data meta-analysis" or IPD, which is considered a gold standard of systematic review. The Runhaar IPD meta-analysis concluded that glucosamine has no effect on pain or physical function.

## Professional Guidelines

79.     Professional guidelines, which are based on systematic, scientific reviews of the literature, are also consistent in their recommendation against using glucosamine or chondroitin.

80.     For example, the National Collaborating Centre for Chronic Conditions ("NCCCC") reported "the evidence to support the efficacy of glucosamine hydrochloride as a symptom modifier is poor" and the "evidence for efficacy of chondroitin was less convincing." NCCCC, Osteoarthritis National Clinical Guideline for Care and Management of Adults, Royal College of Physicians, London 2008. Consistent with its lack of efficacy findings, the NCCCC Guideline did not recommend the use of glucosamine or chondroitin for treating osteoarthritis. *Id.*

at 33.

81.     In December 2008, the American Academy of Orthopaedic Surgeons (AAOS) published clinical practice guidelines for the "Treatment of Osteoarthritis of the Knee (Non-Arthroplasty)," and recommended that "glucosamine and/or chondroitin sulfate or hydrochloride not be prescribed for patients with symptomatic OA of the knee." This recommendation was given a grade A, the highest level of recommendation. Richmond et al., *Treatment of osteoarthritis of the knee (nonarthroplasty)*, J. Am. Acad. Orthop. Surg. Vol. 17 No. 9 591-600 (2009). This recommendation was based on a 2007 report from the Agency for Healthcare Research and Quality (AHRQ), which states that "the best available evidence found that glucosamine hydrochloride, chondroitin sulfate, or their combination did not have any clinical benefit in patients with primary OA of the knee." Samson et al., *Treatment of Primary and Secondary Osteoarthritis of the Knee*, Agency for Healthcare Research and Quality, 2007 Sep 1. Report No. 157.

82.     In 2009, a panel of scientists from the European Food Safety Authority ("EFSA") (a panel established by the European Union to provide independent scientific advice to improve food safety and consumer protection), reviewed nineteen studies submitted by an applicant, and concluded that "a cause and effect relationship has not been established between the consumption of glucosamine hydrochloride and a reduced rate of cartilage degeneration in individuals without osteoarthritis." EFSA Panel on Dietetic Products, Nutrition and Allergies, *Scientific Opinion on the substantiation of a health claim related to glucosamine hydrochloride and reduced rate of cartilage degeneration and reduced risk of osteoarthritis*, EFSA Journal (2009), 7(10):1358.

83.     In a separate opinion from 2009, an EFSA panel examined the evidence for glucosamine (either hydrochloride or sulfate) alone or in combination with chondroitin sulfate and maintenance of joints. The claimed effect was "joint health," and the proposed claims included

"helps to maintain healthy joint," "supports mobility," and "helps to keep joints supple and flexible." Based on its review of eleven human intervention studies, three meta-analyses, 21 reviews and background papers, two animal studies, one in vitro study, one short report, and one case report, the EFSA panel concluded that "a cause and effect relationship has not been established between the consumption of glucosamine (either as glucosamine hydrochloride or as glucosamine sulphate), either alone or in combination with chondroitin sulphate, and the maintenance of normal joints." EFSA Panel on Dietetic Products, Nutrition and Allergies, *Scientific Opinion on the substantiation of health claims related to glucosamine alone or in combination with chondroitin sulphate and maintenance of joints and reduction of inflammation*, EFSA Journal (2009), 7(9):1264.

84.     In 2012, EFSA examined the evidence glucosamine of sulfate or glucosamine hydrochloride, and a claimed effect of "contributes to the maintenance of normal joint cartilage." Based on its review of 61 references provided by Merck Consumer Healthcare, the EFSA panel concluded that "a cause and effect relationship has not been established between the consumption of glucosamine and maintenance of normal joint cartilage in individuals without osteoarthritis." EFSA Panel on Dietetic Products, Nutrition and Allergies, *Scientific Opinion on the substantiation of a health claim related to glucosamine and maintenance of normal join*t cartilage, EFSA Journal 2012, 10(5): 2691.

85.     EFSA published an opinion in 2009 titled *Scientific Opinion on the substantiation of health claims related to methylsulfonylmethane alone or in combination with glucosamine hydrochloride and maintenance of joints*, EFSA Journal 2009, 7(9):1268. The opinion addressed the scientific evidence relating to joint health claims about MSM with or without glucosamine hydrochloride, and found "that a cause and effect relationship has not been established between

consumption of methylsulfonylmethane, either alone or in combination with glucosamine hydrochloride, and the maintenance of normal joints." *Id*. at 2.

86.     In 2013, the AAOS published an updated review and meta-analysis of the scientific literature, and again made a "strong" recommendation that neither glucosamine nor chondroitin be used for patients with symptomatic osteoarthritis of the knee. *See* American Academy of Orthopaedic Surgeons, Treatment of Osteoarthritis of the Knee: Evidence-Based Guideline (2d ed. 2013). "Twenty-one studies were included as evidence for this recommendation."

87.     Likewise, the American College of Rheumatology ("ACR"), the United Kingdom National Institute for Health and Care Excellence ("NICE"), and the Agency for Healthcare Research and Quality ("AHRQ") (one of the agencies within the United States Department of Health and Human Services) each published clinical guidelines for the treatment of osteoarthritis based on a critical review of published clinical research, including for glucosamine and chondroitin. These professional groups also recommend against using glucosamine or chondroitin for managing the pain, reduced function, and quality of life issues associated with osteoarthritis. Hochberg MC et al., *American College of Rheumatology 2012 Recommendations for the Use of Nonpharmacologic and Pharmacologic Therapies in Osteoarthritis of the Hand, Hip, and Knee*, Arthritis Care & Research, 64(4):465-474 (2012); NICE National Institute for Health and Care Excellence. *Osteoarthritis: Care and management in adults*. Clinical guideline 177. Methods, evidence and recommendations (February 2014); Samson DJ et al., *Treatment of Primary and Secondary Osteoarthritis of the Knee. Evidence Report/Technology Assessment*, Number 157. Prepared for Agency for Healthcare Research and Quality, U.S. Department of Health and Human Services, Publication No. 07-E012 (2007).

88.     The AAOS, ACR, NICE and AHRQ guidelines were based on systematic reviews and/or meta-analyses of all of the available study data. For example, the ACR specifically cited its reliance on the GAIT study coupled with four meta-analyses that "failed to demonstrate clinically important efficacy for these agents": Towheed (2005); Vlad (2007); Reichenbach (2007); and Wandel (2010). The NICE authors' conclusion that practitioners should "not offer glucosamine or chondroitin products" was based on a review that included Towheed (2005), which included 25 glucosamine RCTs, Reichenbach (2007), which included 22 chondroitin RCTs, and seven studies that compared glucosamine plus chondroitin versus placebo. The 2007 AHRQ assessment was based on review of 21 glucosamine/chondroitin studies, including GAIT. The AAOS' 2013 "strong" recommendation against glucosamine and chondroitin was based on expert analysis and meta-analyses of 12 glucosamine studies, 8 chondroitin studies, and one study (GAIT) that assessed both.

## IV.    *The Impact of Defendant's Wrongful Conduct*

89.     Despite clinical studies demonstrating the Move Free Advanced Products' ineffectiveness, Defendant conveyed and continues to convey one uniform joint health message: that the Move Free Advanced Products are joint health supplements capable of supporting and benefiting joint health.

90.     As the manufacturer and distributor of the Move Free Advanced Products, Defendant possesses specialized knowledge regarding the Move Free Advanced Products' content and effects of their ingredients, and Defendant is in a superior position to know whether the Move Free Advanced Products work as advertised.

91.     Specifically, Defendant knew, but failed to disclose, or should have known, that the Move Free Advanced Products cannot benefit joint health and that well-conducted, clinical studies

28

have found the Move Free Advanced Products' primary ingredients unable to support or benefit joint health.

92.     Plaintiff and the class members have been and will continue to be deceived or misled by Defendant's false and deceptive joint health representations.

93.     Defendant's joint health representations and omissions were a material factor in influencing Plaintiff's and the class members' decision to purchase the Move Free Advanced Products. In fact, the only purpose for purchasing the Move Free Advanced Products is to obtain the represented joint health benefits.

94.     Defendant's conduct has injured Plaintiff and the class members because Defendant's Move Free Advanced Products are worthless and cannot support or benefit joint health as advertised.

95.     Had Plaintiff and the class members known the truth about Defendant's Move Free Advanced Products, they would not have purchased the Move Free Advanced Products and would not have paid the prices they paid for the Move Free Advanced Products.

96.     Plaintiff and each class member was harmed by purchasing Defendant's Move Free Advanced Products because none of the Move Free Advanced Products are capable of providing their advertised benefits. As a result, Plaintiff and each class member lost money and property by way of purchasing Defendant's ineffective and worthless capsules.

## CLASS DEFINITION AND ALLEGATIONS

97.     Plaintiff, pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3), brings this action on behalf of the following class:

**Multi-State Class**

All persons in Illinois and other states with similar laws,[2] who purchased any of the Move Free Advanced Products for personal use between May 28, 2015, and the date notice is disseminated.

98.　　In the alternative, Plaintiff brings this action on behalf of herself and all other similarly situated Illinois consumers pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class:

**Illinois-Only Class**

All persons in Illinois who purchased any of the Move Free Advanced Products for personal use between May 28, 2015, and the date notice is disseminated.

99.　　Excluded from either Class is Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Move Free Advanced Products for resale, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

100.　　Certification of Plaintiff's claims for class wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

101.　　**Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that individual joinder of all Class members is impracticable. Defendant has sold many thousands of units of Move Free Advanced Products to Class members.

---

[2]　　While discovery may alter the following, Plaintiff preliminarily avers other states with similar consumer fraud laws under the facts of this case include, but are not limited to: Florida (Fla. Stat. §§ 501.201, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §§ 445.901, *et seq.*); Minnesota (Minn. Stat. §§ 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. §§ 407.010, *et seq.*); New Jersey (N.J. Stat. §§ 56:8-1, *et seq.*); and Washington (Wash. Rev. Code §§ 19.86.010, *et seq.*) (collectively, the "Class States").

102.     **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2)
and 23(b)(3).** This action involves common questions of law and fact, which predominate over
any questions affecting individual Class members, including, without limitation:

(a)     Whether the representations discussed herein that Defendant made about its
Move Free Advanced Products were or are true, misleading, or likely to
deceive;

(b)     Whether Defendant's conduct violates public policy;

(c)     Whether Defendant engaged in false or misleading advertising;

(d)     Whether Defendant's conduct constitutes violations of the laws asserted
herein;

(e)     Whether Plaintiff and the other Class members have been injured and the
proper measure of their losses as a result of those injuries; and

(f)     Whether Plaintiff and the other Class members are entitled to injunctive,
declaratory, or other equitable relief.

103.     **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are
typical of the other Class members' claims because, among other things, all Class members were
comparably injured through the uniform prohibited conduct described above.

104.     **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).**
Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with
the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel
competent and experienced in complex class action litigation; and Plaintiff intend to prosecute this
action vigorously. The interests of the Class members will be fairly and adequately protected by
Plaintiff and her counsel.

105.     **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).**
Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other
Class members, thereby making appropriate final injunctive relief and declaratory relief, as
described below, with respect to Class as a whole.

106.     **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is
superior to any other available means for the fair and efficient adjudication of this controversy,
and no unusual difficulties are likely to be encountered in the management of this class action. The
damages or other financial detriment suffered by Plaintiff and the other Class members are
relatively small compared to the burden and expense that would be required to individually litigate
their claims against Defendant, so it would be impracticable for Class members to individually
seek redress for Defendant's wrongful conduct. Even if Class members could afford individual
litigation, the court system could not. Individualized litigation creates a potential for inconsistent
or contradictory judgments, and increases the delay and expense to all parties and the court system.
By contrast, the class action device presents far fewer management difficulties, and provides the
benefits of single adjudication, economy of scale, and comprehensive supervision by a single
court.

## CLAIMS ALLEGED

### COUNT I

**Violation of the Illinois Deceptive Practices and Consumer Fraud Act ("ICFA")**
**815 ILCS 505/2**

107.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

108.     Plaintiff Maureen Carrigan brings this claim individually and on behalf of the
Multi-State Class or in the alternative, the Illinois-Only Class.

109.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2 prohibits unfair methods of competition and unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, or misrepresentation in the conduct of any trade or commerce.

110.     Plaintiff and the other Class members are consumers who purchased the Move Free Advanced Products.

111.     Defendant's conduct, described above, in misrepresenting and omitting material facts regarding the Move Free Advanced Products constitutes an unfair or deceptive practice and was and is likely to mislead reasonable consumer, as detailed above.

112.     A reasonable consumer would consider the promise of receiving something other than as promised to be important when making a decision to purchase the Move Free Advanced Products.

113.     Defendant's practices were unfair because they offended public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers.

114.     Defendant's unfair and deceptive acts or practices were the foreseeable and actual cause of Plaintiff's and other Class members suffering actual damages on account of receiving a product that was not as advertised.

115.     Plaintiff and the other Class members paid a particular price for a product in accordance with defendants' representations. When they received a product that was not in conformity with those representations and their reasonable expectations, Plaintiff and the other Class members were damaged on account of receiving the Move Free Advanced Products that were other than as advertised.

## JURY DEMAND

116.     Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant as follows:

A.     Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

B.     Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of Defendant's unlawful, unfair and fraudulent business practices;

C.     Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

D.     Ordering damages for Plaintiff and the Classes;

E.     Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

F.     Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

G.     Ordering such other and further relief as may be just and proper.

Respectfully submitted,

Dated: October 22, 2018       By:    Ben Barnow

Ben Barnow
Erich P. Schork
**BARNOW AND ASSOCIATES, P.C.**
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Tel: 312/621-2000
312/641-5004 (fax)
b.barnow@barnowlaw.com
e.schork@barnowlaw.com

Timothy G. Blood (PHV to be filed)
Thomas J. O'Reardon II (PHV to be filed)
**BLOOD HURST & O'REARDON, LLP**
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com

Todd D. Carpenter (*PHV to be filed*)
**CARLSON LYNCH SWEET KILPELA**
    **& CARPENTER, LLP**
1350 Columbia Street, Suite 603
San Diego, CA 92101
Tel: 619/762-1910
619/756-6991 (fax)
tcarpenter@carlsonlynch.com

Edwin J. Kilpela, Jr. (*PHV to be filed*)
**CARLSON LYNCH SWEET KILPELA**
    **& CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: 412/322-9243
412/231-0246 (fax)
ekilpela@carlsonlynch.com

*Attorneys for Plaintiff*